**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM MARK SMILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-191 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

### I. INTRODUCTION

William Mark Smiley ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). This matter comes before the Court on cross motions for summary judgment. (ECF Nos. 7, 9). For the reasons that follow, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.

### II. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI with the Social Security Administration December 4, 2006, claiming an inability to work beginning July 8, 2006 due to limitations stemming from various physical and mental impairments. (R. at 116 – 126).[1] Plaintiff was initially denied benefits on March 21, 2007. (R. at 81 – 90). A hearing was scheduled for December 18, 2008,

---

[1] Citations to ECF Nos. 5 – 4-5, the Record, *hereinafter*, "R. at __."

and Plaintiff and a vocational expert testified. (R. at 21 – 64). The Administrative Law Judge ("ALJ") issued her decision denying benefits to Plaintiff on January 14, 2009. (R. at 7 – 20). Plaintiff's request for review by the Appeals Council was denied on June 24, 2010, thereby rendering the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5). Plaintiff filed his complaint on August 11, 2010 challenging the ALJ's decision. (ECF No. 2). Cross motions for summary judgment followed.

### III. LEGAL STANDARD

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3rd Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner

(Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3rd Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[2], 1383(c)(3)[3]; *Schaudeck v. Comm'r Soc. Sec.*, 181 F. 3d 429, 431 (3rd Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3rd Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3rd Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the

---

[2] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3rd Cir. 1986).

## IV. EVIDENTIARY RECORD

### A. General Background

Plaintiff claimed disability due to alleged anxiety, depression, HIV infection, back pain, gout, and high blood pressure. (R. at 141). Plaintiff claimed that he was precluded from all forms of work primarily by his anxiety and depression. (R. at 141). At the time of his administrative hearing, Plaintiff was forty six years of age. (R. at 26). Plaintiff lived with his sister. (R. at 27). He was divorced and had six children. (R. at 27, 221). His family was unaware of his HIV infection. (R. at 274). Plaintiff had only a tenth grade education, required special educational support, and had behavioral problems. (R. at 27, 335). Plaintiff did receive some technical school training for machine operation; however, he did not receive any diploma or certificate. (R. at 335). Plaintiff had last worked in July 2006 as a mold technician at a plastics company. (R. at 142 – 43). Prior to that time, he had worked in a variety of other positions for several months to several years at a time. (R. at 143). Plaintiff now subsisted on

public assistance. (R. at 28). He had received unemployment compensation for twenty-six weeks following the loss of his last job. (R. at 28).

In his own report of day-to-day functioning, Plaintiff claimed to have lost all interest in hobbies. (R. at 160 – 70). He did not respond well to criticism, and had difficulty being around others due to paranoia and anxiety regarding his HIV infection. (R. at 160 – 70). He claimed that close proximity to others made him nervous. (R. at 160 – 70). He stated that he had been terminated from his previous four jobs due to difficulty meeting attendance requirements. (R. at 160 – 70). He did not experience difficulty keeping up with his work, however. (R. at 160 – 70).

Plaintiff did not report any difficulties with personal care, driving, and using public transit, and attested to only some limitation mowing the lawn and carrying grocery bags. (R. at 160 – 70). He only cooked boxed foods. (R. at 160 – 70). Plaintiff could engage in continuous activity for approximately twenty minutes before requiring rest. (R. at 160 – 70). However, he could not recall specific activities in which he engaged that forced him to stop and rest. (R. at 160 – 70). He could walk approximately two hundred feet, and he could lift up to twenty pounds. (R. at 160 – 70). He alleged having no energy. (R. at 160 – 70). He claimed that his back pain interrupted his sleep. (R. at 160 – 70). However, prescribed medication successfully relieved his pain for up to eight hours, and he did not notice side effects. (R. at 160 – 70). Plaintiff could not recall attending physical therapy for his back pain. (R. at 160 – 70). He could ambulate independently, without an assistive device. (R. at 160 – 70).

**B. Medical History**

Plaintiff's primary care physician, Lynn L. Cornell, M.D., was primarily responsible for treatment and care of Plaintiff's physical and mental conditions, excluding management and

monitoring of his HIV infection. Her earliest records of treatment of Plaintiff date back to February 2005. (R. at 262 – 64). At that time, Plaintiff was diagnosed with hypertension, gout, and depression, but all were considered to be stable. (R. at 262 – 64).

Plaintiff returned to Dr. Cornell on March 3, 2005, complaining of worsening depression and anxiety associated with problems with his family. (R. at 264). He claimed to be having difficulty concentrating on his work, and requested an excuse. (R. at 264). Dr. Cornell provided a letter indicating that Plaintiff should remain off of work until March 14, 2005. (R. at 264). She reported in her notes that Plaintiff had been working regularly until his most recent visit. (R. at 264).

Plaintiff was seen again by Dr. Cornell on April 12 and 14, 2005. (R. at 265). He claimed to feel generally unwell: he was nauseated, achy, and anxious. (R. at 265). He was experiencing difficulty with his children and his alcohol intake was increasing. (R. at 265). Dr. Cornell provided Plaintiff with medical excuses to miss work through April 18, 2005. (R. at 265).

No further notes of treatment through Dr. Cornell appeared on the record until February 1, 2006. (R. at 268). Plaintiff returned complaining of gout symptoms in his left knee, ankle, and foot, for significantly increased depression, and for moderate, increasing mid-thoracic back pain. (R. at 268). With respect to his depression, Plaintiff more specifically indicated that he had lost two jobs since his last visit due to depression-related absenteeism, that he was experiencing anxiety attacks up to twice per week, and that he had difficulty interacting with other people. (R. at 268). In terms of his back pain, Plaintiff rated his discomfort as 5 on a pain scale of 10. (R. at 268). He claimed that he could stand for no more than four hours at a time,

and sit for no more than ten or fifteen minutes. (R. at 268). His pain interrupted his sleep. (R. at 268).

Dr. Cornell opined that Plaintiff was unable to work at that time. (R. at 268). An injection was administered for Plaintiff's back pain, pain medication was prescribed, and Plaintiff's anti-depressant dosage was increased. (R. at 268). Plaintiff was advised to seek the help of a psychiatrist. (R. at 268).

At a follow-up with Dr. Cornell on February 9, 2006, Plaintiff explained that his gout symptoms decreased significantly, and the anti-inflammatory medication and pain relievers prescribed were very helpful. (R. at 271). Plaintiff's blood pressure was noted to be good. (R. at 271). Plaintiff felt that his depression and anxiety were the same, however. (R. at 271). Dr. Cornell completed an Employability Assessment Form that same day, and stated that Plaintiff was temporarily disabled from all work beginning December 1, 2005 and ending July 31, 2006 as a result of anxiety, depression, back pain, hypertension, and gout. (R. at 270, 272).

An x-ray of Plaintiff's cervical spine on May 14, 2006 indicated that the vertebrae were normal, no compression or fracture was observed, no bony lesions were present, alignment was normal, there was no evidence of subluxation, disc space and size were normal, and the surrounding soft tissue was normal. (R. at 209).

On June 14, 2006, Plaintiff visited Dr. Cornell for a follow-up regarding his hypertension. (R. at 276). Plaintiff was experiencing anxiety and depression, and was seeing a counselor through the Erie County Health Department, as well as a case manager for his HIV infection. (R. at 276). Although Plaintiff was still not working, he was only experiencing some back pain, he had no recurrence of gout symptoms, and his appetite was good. (R. at 276). He was advised to seek psychiatric care for continuing anxiety and depression, particularly as it

related to his HIV infection. (R. at 276). Plaintiff informed Dr. Cornell that he was seeking disability benefits. (R. at 276). That same day, Dr. Cornell completed an Employability Re-assessment Form, indicating that Plaintiff was temporarily disabled from all work beginning December 1, 2005 and ending December 30, 2006, due to depression, anxiety, gout, hypertension, and back pain. (R. at 277 – 78).

At an October 5, 2006 check-up, Dr. Cornell assessed the status of Plaintiff's various impairments, and diagnosed him with borderline hypertension, requiring only monitoring, stable anxiety, back pain, and hemorrhoids. (R. at 281). In terms of his anxiety, Plaintiff was again advised to see a counselor, but he was reluctant to do so. (R. at 281). Plaintiff claimed that he had some increased anxiety due to family issues, but that he otherwise felt well. (R. at 281). Plaintiff stated that his back pain had recently increased, but that it was related to his having fallen into a hole. (R. at 281). He had used his prescription medications for this condition sparingly, however. (R. at 281).

Howard Nadworny, M.D., Plaintiff's treating physician for his HIV infection, completed a Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection on December 8, 2006. (R. at 312 – 14). On it, he noted that Plaintiff's most recent immune system numbers were close to normal. (R. at 312 – 14). As a result, Plaintiff had not begun HIV-specific treatment. (R. at 312 – 14). Plaintiff was noted to be generally asymptomatic for HIV infection, at that time. (R. at 312 – 14).

On February 16, 2007, John J. Kalata, D.O. completed a Medical Source Statement of Claimant's Ability to Perform Work-related Physical Activities on behalf of the Pennsylvania Bureau of Disability Determination. (R. at 318 – 23). In it, Dr. Kalata indicated that Plaintiff could lift and carry no more than twenty pounds occasionally, and no amount of weight

frequently.  (R. at 318 – 23).  Plaintiff could stand and walk no more than one or two hours in an eight hour work day.  (R. at 318 – 23).  Plaintiff could sit approximately six hours.  (R. at 318 – 23).  Pushing and pulling in Plaintiff's upper and lower extremities was limited to an unspecified degree.  (R. at 318 – 23).  Plaintiff had no ability to bend, kneel, stoop, crouch, balance, or climb.  (R. at 318 – 23).

Dr. Kalata provided an accompanying report of his objective observations to support the above conclusions.  (R. at 327 – 32).  Dr. Kalata recorded Plaintiff as claiming disability as a result of HIV infection, gout, depression, hypertension, and general, chronic pain.  (R. at 327 – 32).  Plaintiff has monitored his HIV infection with the Erie County Department of Health, and with infectious disease specialist Nadworny.  (R. at 327 – 32).  Plaintiff indicated that his HIV diagnosis was the catalyst for his downward depressive spiral.  (R. at 327 – 32).  He claimed that he had lost his last four jobs due to depression and exhaustion.  (R. at 327 – 32).  He also reported difficulty getting along with others.  (R. at 327 – 32).  He was constantly in fear of spreading this disease through accidental cuts, and preferred not to be around other people.  (R. at 327 – 32).  Plaintiff claimed that he had been seeking counseling through the AIDS Alliance of Erie, Pennsylvania, but stopped following the death of his therapist in an automobile accident.  (R. at 327 – 32).

Plaintiff had not yet begun HIV-specific treatment.  (R. at 327 – 32).  He had not displayed HIV symptoms to that point.  (R. at 327 – 32).  Plaintiff's history of hypertension and gout were noted.  (R. at 327 – 32).  Both conditions were treated with medication.  (R. at 327 – 32).  At the time of his examination, Plaintiff was unemployed and without health insurance.  (R. at 327 – 32).

Following a physical examination, Dr. Kalata's diagnostic impression was "HIV positivity x 4 years," "clinical depression still symptomatic," "suicidal ideation," "chronic ethanol abuse," "gout," "uncontrolled hypertension," "history of anxiety attacks with panic disorder," "degenerative joint disease of the hands," and "history of fractured vertebrae in the past." (R. at 327 – 32). Plaintiff had been found to have upper thoracic and mid-lumbar spasm with diminished range of motion. (R. at 327 – 32). His gait and reflexes were normal, however. (R. at 327 – 32). Plaintiff's strength in his upper and lower extremities was largely intact. (R. at 327 – 32). Plaintiff was alert and oriented, but somewhat tearful and depressed-appearing. (R. at 327 – 32). No other significant abnormality was noted. (R. at 327 – 32).

On February 22, 2007, Plaintiff underwent a psychological evaluation, conducted by Byron E. Hillin, Ph.D. on behalf of the Pennsylvania Bureau of Disability Determination. (R. at 333 – 42). At that time, Plaintiff alleged that he could not work due to depression and associated paranoia. (R. at 333 – 42). Plaintiff blamed his HIV diagnosis for his progressively worsening depression. (R. at 333 – 42). Plaintiff acknowledged that other medical issues also contributed to his claimed disability, including gout, back pain, and knee problems. (R. at 333 – 42). He generally described himself to Dr. Hillin as avoidant, and that he worried that the people in his community may learn about his HIV infection, and that he may accidentally spread it to other people. (R. at 333 – 42). Plaintiff stated that even prior to his HIV diagnosis, he was an anxious and somewhat paranoid person in social situations. (R. at 333 – 42).

Plaintiff believed that his depression caused him to sleep for long periods, although the sleep was often poor. (R. at 333 – 42). Plaintiff blamed the loss of his last four jobs on lack of motivation to attend work due to his depressive state. (R. at 333 – 42). He had a few friends, and was increasingly withdrawing from social situations. (R. at 333 – 42). Plaintiff did not

participate in former hobbies. (R. at 333 – 42). Plaintiff was capable of caring for himself independently. (R. at 333 – 42).

Plaintiff admitted that he had not engaged in professional psychiatric treatment in the past. (R. at 333 – 42). He only received anti-depressant medication from his primary care doctor. (R. at 333 – 42). He denied use of narcotics for pain management, preferring to use ibuprofen. (R. at 333 – 42). Plaintiff also never received professional treatment for drug or alcohol use, despite a problematic drinking history. (R. at 333 – 42).

Plaintiff claimed that he often felt hopeless and helpless, and often thought it would be best to commit suicide. (R. at 333 – 42). He felt isolated. (R. at 333 – 42). His appetite was allegedly poor. (R. at 333 – 42). He described frequently feeling restless and pacing around his house as a consequence. (R. at 333 – 42). Plaintiff denied hallucinations, obsessions, and compulsions. (R. at 333 – 42).

During the evaluation, Plaintiff was noted to be cooperative, open, truthful, and consistent. (R. at 333 – 42). Dr. Hillin further observed that Plaintiff was alert and oriented, and his dress casual. (R. at 333 – 42). Plaintiff was somewhat disheveled, and his grooming and hygiene were thought to be fair to poor. (R. at 333 – 42). Plaintiff ambulated without difficulty, was mildly restless and anxious, and made good eye contact. (R. at 333 – 42). Plaintiff's speech was relevant, coherent, and goal-directed, his speech production was normal, his perceptive and expressive language functions were intact, no significant problems with memory or concentration were noted, and he generally processed information appropriately. (R. at 333 – 42). There was no loosening of associations or thought disturbances. (R. at 333 – 42). Intellect was in the average to low-average range. (R. at 333 – 42). Social judgment was intact. (R. at 333 – 42).

Dr. Hillin diagnosed Plaintiff with moderate, single episode major depressive disorder, and alcohol abuse. (R. at 333 – 42). Plaintiff was given a global assessment of functioning[4] ("GAF") score of 60. (R. at 333 – 42). Dr. Hillin noticed only mild distress and anxiety, and only moderate depression. (R. at 333 – 42). Other than fearing that others would learn of his HIV status, Dr. Hillin found no paranoia. (R. at 333 – 42). Plaintiff was able to read, performed simple math, and demonstrated fair attention and concentration. (R. at 333 – 42). Plaintiff's insight was fair. (R. at 333 – 42). If Plaintiff sought professional counseling for his depression, and alcohol abuse, Dr. Hillin believed his prognosis would be fair. (R. at 333 – 42). Plaintiff was believed to be somewhat guarded, defensive, and fearful. (R. at 333 – 42). He was socially withdrawn and hypersensitive. (R. at 333 – 42). His coping was believed to be fragile. (R. at 333 – 42). Plaintiff was indicated to be markedly limited in interacting appropriately with the public, supervisors, and co-workers, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting. (R. at 333 – 42).

---

[4] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

Plaintiff was otherwise not limited to moderately limited in all other areas of functioning. (R. at 333 – 42).

A physical residual functional capacity ("RFC") assessment was performed by state agency physician Mary Ellen Wyszomierski, M.D. on March 6, 2007. (R. at 345 – 51). Based upon a review of Plaintiff's medical file, she listed Plaintiff's diagnoses as HIV infection, gout, thoracolumbar spasm, degenerative disease of the hands, and hypertension. (R. at 345 – 51). In spite of these impairments, she found Plaintiff was capable of occasionally lifting twenty pounds, and frequently lifting ten; could stand and walk approximately six hours of an eight hour work day; and could sit approximately six hours. (R. at 345 – 51). She further found Plaintiff was limited to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. at 345 – 51). Plaintiff had limited reaching. (R. at 345 – 51). Plaintiff was not otherwise found to be limited. (R. at 345 – 51).

Dr. Wyszomierski supported her conclusions by noting that Plaintiff had not yet begun treatment for HIV and he was asymptomatic. (R. at 345 – 51). Plaintiff's gout and hypertension were controlled on medication. (R. at 345 – 51). While Plaintiff had pain in his thoracic spine, she noted he reported being able to stand for four hours a day. (R. at 345 – 51). Plaintiff did not require an assistive device to walk and had never seen a specialist for alleged pain in most of his joints. (R. at 345 – 51). In Dr. Wyszomierski's opinion, the Plaintiff's activities of daily living suggested a lesser degree of limitation than claimed by Plaintiff. (R. at 345 – 51). Further, when the findings of Dr. Kalata were compared with the record as a whole, she concluded that Dr. Kalata's limitations findings appeared to underestimate the Plaintiff's functional capacity. (R. at 345 – 51).

On March 7, 2007, Plaintiff was seen by Dr. Cornell for a medical assessment for the purpose of Plaintiff's disability claim. (R. at 370). Dr. Cornell noted Plaintiff's claimed inability to hold past jobs due to absences, depression, anxiety, and back pain. (R. at 370). At times, Plaintiff experienced anxiety attacks. (R. at 370). Plaintiff rated his back pain as 6 on a pain scale of 10. (R. at 370). He complained of stiffness in the morning, and difficulty getting out of bed in the morning – often requiring assistance. (R. at 370). Plaintiff could stand for no more than forty five minutes at a time, and could sit less than an hour. (R. at 370). His back pain radiated from the mid-thoracic region, into his lower back, and into his right leg. (R. at 370). He could, however, forward flex and stand on his toes. (R. at 370). His HIV infection had not yet required treatment. (R. at 370).

That same day, Dr. Cornell completed another Employability Assessment Form. (R. at 369, 373). In it, she indicated that Plaintiff was permanently disabled from all forms of work, and that Plaintiff was a candidate for disability benefits. (R. at 369, 373). Dr. Cornell cited Plaintiff's depression, anxiety, chronic back pain, gout, and hypertension as the primary impairments contributing to his disability. (R. at 369, 373).

On March 12, 2007, state agency evaluator Manella Link, Ph.D. completed a mental RFC assessment of Plaintiff. (R. at 352 – 54). Based upon a review of Plaintiff's record, Dr. Link found Plaintiff to suffer from both affective disorders and substance addiction disorders. (R. at 352 – 54). However, Plaintiff was only moderately to not significantly limited in all areas of functioning. (R. at 352 – 54). As support for these findings, Dr. Link cited Plaintiff's lack of psychiatric hospitalization, and Dr. Hillin's earlier findings. (R. at 352 – 54). He found Dr. Hillin's statements concerning the Plaintiff's abilities "in the areas of making occupational adjustments, making performance adjustments and making personal and social adjustments"

were "fairly consistent with the other evidence in the file." (R. at 354). Dr. Link assigned "appropriate weight" to Dr. Hillin's opinion, noting that it was partially consistent with his assessment. (R. at 354). Dr. Link found Plaintiff to be only partially credible, and capable of maintaining full-time employment. (R. at 352 – 54).

On October 24, 2007, Plaintiff appeared at Dr. Cornell's office due to recent worsening of his back pain attributed to missing a step while stepping off of his sister's deck. (R. at 374). The pain was primarily in his lower back, and occasionally radiated into his legs. (R. at 374). Plaintiff claimed that the pain interrupted his sleep. (R. at 374). Foot dorsiflexion, knee extension, and hip flexion and strength were all normal. (R. at 374). Plaintiff was prescribed anti-inflammatories and pain medication, and was instructed to do back stretching exercises. (R. at 374).

Plaintiff began treating his HIV infection under the supervision of Dr. Nadworny on December 18, 2007. (R. at 391 – 92). At that time, Plaintiff reported that he was doing well, although he had experienced weight loss and was frequently fatigued. (R. at 391 – 92). Plaintiff stated that he was taking medication for blood pressure, but did not report being treated for any other conditions. (R. at 391 – 92). He reported no other problems. (R. at 391 – 92).

Plaintiff visited Dr. Cornell again on March 13, 2008 for assessment of his hypertension and gout. (R. at 376). Plaintiff had slipped on ice the day before and exacerbated his back pain. (R. at 376). An x-ray of Plaintiff's thoracic spine showed mild to moderate degenerative thoracic vertebral spondylosis, but no acute abnormalities or significant chronic deformities. (R. at 381). He was provided additional prescription pain medication. (R. at 376). Plaintiff was observed to be feeling better, overall. (R. at 376). Plaintiff was considering returning to work.

(R. at 376). Plaintiff was continuing treatment for his HIV infection and was faring well. (R. at 376, 390).

On October 7, 2008, Plaintiff reported to Dr. Cornell's office with complaints of pain. (R. at 406). Plaintiff alleged an uptick in back pain beginning in August. (R. at 406). He claimed that he had been seeing a chiropractor twice a week. (R. at 406). Plaintiff's pain was recently made even worse when his riding lawn mower rolled over onto him. (R. at 406). His pain was mostly confined to the lower back. (R. at 406). Plaintiff was recommended for imaging of his back and physical therapy. (R. at 406). On October 20, 2008, x-rays of Plaintiff's thoracic spine showed degenerative thoracic vertebra spondylosis, but no acute abnormalities. (R. at 410). X-rays of the lumbrosacral spine showed progressive compression deformity at the L1 level, which was chronic and related to underlying osteoporosis. (R. at 414). There were less pronounced abnormalities at the L2 – L3 level of the spine. (R. at 414). No acute abnormalities were found, however. (R. at 414).

On November 13, 2008, Plaintiff continued to complain of back pain and it was reported that he had difficulty getting out of a chair. (R. at 401).

On December 23, 2008, Dr. Cornell filled out a brief Medical Source Statement regarding Plaintiff's impairments. (R. at 416). Plaintiff was indicated as suffering from chronic pain and fatigue. (R. at 416). As a result, Plaintiff was believed to require the ability to lay down and rest randomly throughout the day. (R. at 416). No other findings were made, and no other notes accompanied the statement. (R. at 416).

### C. Administrative Hearing

Plaintiff claimed that his inability to work, and the reason for the loss of his most recent jobs, stemmed from depression and anxiety related to his HIV status, digestive problems, back

pain, fatigue, and poor attendance. (R. at 29, 32, 43). Plaintiff did not socialize frequently. (R. at 33). He had difficulty around others, and was paranoid, moody, and short-tempered. (R. at 38, 43, 46). He preferred to isolate himself, and spent a great deal of time laying in his room. (R. at 33). He watched television and listened to music, but did not do much else. (R. at 35). Plaintiff would lay down for three-and-one-half hours to four hours per day. (R. at 42).

Plaintiff had not sought the help of therapists, social workers, or psychologists. (R. at 36). Plaintiff was, however, part of a support group for individuals with HIV. (R. at 36). Plaintiff only felt comfortable speaking with Dr. Cornell regarding his mental issues. (R. at 37, 45). Dr. Cornell was primarily responsible for treating Plaintiff's psychological disorders. (R. at 40 – 41, 45).

Plaintiff testified that he had undergone back surgery at an early age, but had not been operated upon for back problems, since. (R. at 32). He claimed that he had engaged in physical therapy. (R. at 32). He claimed that he had never received any injections for pain, but he did use prescription pain medication. (R. at 32 – 33, 39). He stated that the medications made him nauseous, sleepy, and unable to maintain concentration. (R. at 33).

Plaintiff claimed that as a result of his back pain, he could sit for no more than twenty minutes at a time, and could stand for approximately the same amount of time. (R. at 35). Plaintiff could walk one city block. (R. at 35 – 36). Lifting a gallon of milk allegedly caused pain in Plaintiff's back. (R. at 42). Plaintiff had difficulty bending, and his pain interrupted his sleep. (R. at 42). He testified that he had to lie down for three to four hours per day due to fatigue and pain. (R. at 43 – 4).

Plaintiff did not help his sister, with whom he lived, with cooking, cleaning, laundry or trash. (R. at 33 – 34). Occasionally he provided minimal help with yard work. (R. at 34).

Plaintiff did maintain a driver's license, and was capable of driving independently. (R. at 34). Plaintiff did go shopping. (R. at 35).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a person of Plaintiff's age, educational experience, and work background would be eligible for a significant number of jobs in existence in the national economy if capable of light work, but limited to lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and walking for six hours of an eight hour work day and sitting for six hours, work not involving the use of knives, sharp objects, or heavy machinery, work not involving cooking or meal preparation, and work requiring only occasional bending, kneeling, stooping, crouching, balancing, climbing, or interaction with the general public. (R. at 51).

In response, the vocational expert described Plaintiff as eligible for work as an "information clerk," with 80,000 positions available in the national economy, and as a "marker," with 225,000 positions available. (R. at 52). The ALJ altered the scenario, adding that the hypothetical person was capable of only sedentary work, lifting no more than ten pounds, standing and walking no more than two hours per day, and sitting for only six hours. (R. at 53).

The vocational expert replied that such a person would be capable of working as a "document preparer," with 26,000 positions available, or as a "telephone clerk," with 80,000 positions available. (R. at 53). The vocational expert went on to say that none of the jobs involved repetitive pushing or pulling with the feet or hands. (R. at 53). The hypothetical person could, however, miss no more than one-and-one-half to two days of work per month. (R. at 54).

The ALJ then asked whether work would still be available if the hypothetical person could not kneel, stoop, crouch, balance, or climb at all. (R. at 54). The vocational expert felt

that Plaintiff could still work as a "marker," or "telephone clerk," but could also work as an "order clerk," or as a "router for public information." (R. at 57).

Plaintiff's counsel followed by asking the vocational expert whether a person that did not respond appropriately to supervisory criticism, or interact appropriately with co-workers or supervisors, would be able to work. (R. at 60 – 61). The vocational expert explained that such a person would not be able to maintain a job. (R. at 61). Plaintiff's counsel then asked whether jobs would be available to a person who would need to lay down throughout the day, beyond the customary breaks and lunch hour. (R. at 62). The vocational expert believed that no jobs would be available to such a person. (R. at 62).

## V. DISCUSSION

In her decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of HIV infection, chronic back pain, and depression. (R. at 13). The ALJ further concluded that Plaintiff was capable of sedentary work, and his impairments limited him to jobs involving no lifting in excess of ten pounds, no preparation of meals/cooking, only occasional contact with the general public, only occasional climbing, balancing, stooping, bending, kneeling, or crouching, and allowing sitting approximately six hours and standing and walking for approximately two hours. (R. at 16). Based upon the testimony of the vocational expert, the ALJ determined that despite the aforementioned limitations, Plaintiff would still qualify for a significant number of jobs in existence in the national economy. (R. at 19 – 20). Plaintiff was not, therefore, entitled to benefits. (R. at 19 – 20).

Plaintiff objects to the determination of the ALJ, arguing that error was committed in consideration of the severity of his physical and mental impairments. (ECF No. 8 at 12 – 28). With respect to Plaintiff's physical impairments, Plaintiff argues that his back condition is his

primary physical impairment. He contends that the ALJ improperly rejected the opinion of his treating physician, Dr. Cornell, that he would be required to lay down unpredictably throughout the day to cope with his back pain and fatigue. (ECF No. 8 at 12 – 22).

Regarding the ALJ's evaluation of Dr. Cornell's opinion, the Third Circuit has repeatedly held that "[a] cardinal principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3rd Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3rd Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3rd Cir. 1994). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3rd Cir. 1993). A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Halter*, 247 F.3d 34, 43 (3rd Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different

judgment"); *Moffat v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010) ("It is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence."). Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

In assigning "little weight" to Dr. Cornell's opinion of the Plaintiff's need to lie down unpredictably throughout the day, the ALJ stated:

> The Administrative Law Judge has also considered Dr. Lynn Cornell's opinion that the claimant's pain and fatigue would cause him to lie down at unpredictable times during the day (Exhibit 20F). Although the Administrative Law Judge does not dispute that Dr. Cornell is a treating source, as provided in 20 C.F.R. §§404.1527 and 416.927, those regulations stipulate that controlling weight is given to a medical opinion on the nature and severity of a claimant's impairments only if (1) the source is a "treating source" as defined in 20 C.F.R. §§404.1502 and 416.902; (2) the opinion is well supported by medically acceptable clinical, laboratory or diagnostic techniques; and (3) the opinion is not inconsistent with other substantial evidence in the case record. An Administrative Law Judge is not bound to accept even a treating physician's conclusion as to disability, particularly, as in this case, when it is not well supported by detailed, clinical and/or diagnostic evidence and/or it is inconsistent with other substantial evidence in the case record.
>
> In this case, Dr. Cornell gives no rationale at all for her opinion, which is not supported by her treatment notes (Exhibit 19F). These notes show few complaints of fatigue and only intermittent complaints of pain. Furthermore, a check off form with no narrative report is weak evidence at best (*Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993)). The reliability of check off reports unaccompanied by written reports is suspect (*Brewster v. Heckler*, 786 F.2d 581, 585 (3rd Cir. 1986)). The Administrative Law Judge gives little weight to this opinion.

(R. at 18). Plaintiff argues that the ALJ's rejection of Dr. Cornell's opinion was based upon a selective and/or inadequate review of the medical record. I agree.

In evaluating a claim for benefits, the ALJ must consider all the evidence in the case. *Plummer,* 186 F.3d at 429. The Third Circuit has also directed that "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence," *Dobrowolsky v. Califano*, 606 F.2 403, 407 (3rd Cir. 1979), and, as previously stated, "adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266. Without this type of explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705-07 (3rd Cir. 1981); *see also Plummer*, 186 F.3d at 429 (ALJ must give some reason for discounting the evidence he rejects).

The ALJ concluded that Dr. Cornell's opinion was not supported by her own treatment note entries which, in her view, demonstrated "few complaints of fatigue" and "only intermittent complaints of pain." (R. at 18). Plaintiff had been treated by Dr. Cornell since February 2005, and, contrary to the ALJ's characterization, every treatment note entry beginning in February 2006 documents complaints of back pain. For example, on February 1, 2006, Plaintiff complained that back pain interrupted his sleep. (R. at 268). As a result, he was administered a Toradol injection and medications were prescribed. (R. at 268). At his February 9, 2006 follow-up visit, Plaintiff discussed applying for disability due to a recurrence of his back pain. (R. at 271). Plaintiff continued to complain of back pain at his June 14, 2006, and October 5, 2006 office visits. (R. at 276, 281). On March 7, 2007, Plaintiff complained of back pain, and reported that he suffered from stiffness in the morning which often required assistance getting out of bed. (R. at 370). He stated that his back pain radiated from his mid-thoracic region and radiated into his lower back and right leg, and Dr. Cornell diagnosed him with chronic back pain. (R. at 370). On October 24, 2007, Plaintiff again complained of increased back pain that

occasionally radiated into his legs after missing a step off a deck. (R. at 374). He indicated that the pain interrupted his sleep. (R. at 374). On March 13, 2008, Plaintiff complained of increased back pain after slipping on ice. (R. at 376). Dr. Cornell noted that he suffered from chronic back pain and prescribed pain medication. (R. at 376). Chronic back pain with "flare ups" was documented in a treatment note entry on August 21, 2008. (R. at 407). On October 7, 2008, Plaintiff again reported an increase in back pain and Dr. Cornell noted that Plaintiff had a history of back pain with flare ups and diagnosed him with chronic back pain. (R. at 406). Plaintiff continued to complain of back pain on November 13, 2008, and it was reported that he had difficulty getting out of a chair. (R. at 401). In sum, Dr. Cornell's notes consistently referenced Plaintiff's complaints of back pain, as well as the provision of prescription medication to ameliorate it. Accordingly the ALJ is directed to address this evidence on remand consistent with *Cotter*.

In addition, while the ALJ concluded that Dr. Cornell's opinion was not well supported by detailed, clinical and/or diagnostic evidence and/or was inconsistent with other substantial evidence in the case record (R. at 18), there are diagnostic studies in the record illustrating some degree of abnormality in Plaintiff's spine arguably supportive of Dr. Cornell's opinion. An x-ray of Plaintiff's thoracic spine in March 2008 and October 2008 showed mild to moderate degenerative thoracic vertebral spondylosis. (R. at 381, 410). A lumbar spine x-ray showed a progressive compression deformity at the L1 level that appeared to be chronic and related to underlying osteoporosis. (R. at 414). Similar but less pronounced abnormalities involved the L2 and L3 levels, which were noted as "significantly changed" from a study dated October 13, 2003. (R. at 414). While the ALJ acknowledged these findings in connection with her evaluation of whether Plaintiff met a Listing (R. at 14), it cannot be determined from her decision that she

considered this evidence in her evaluation of Dr. Cornell's opinion. The ALJ is directed to address this evidence in her evaluation of Dr. Cornell's opinion on remand.[5]

Similar deficiencies are found with respect to the ALJ's evaluation of the medical evidence relative to the Plaintiff's mental impairments. Plaintiff underwent a psychological evaluation performed by Dr. Hillin on February 27, 2007. (R. at 333 – 340). In evaluating Dr. Hillin's assessment, the ALJ observed that no memory or significant concentration/attention problems were noted, and that Plaintiff's speech and thought processes were coherent, relevant, and goal directed. (R. at 14). The ALJ further observed that Dr. Hillin assessed Plaintiff with a GAF score of 60, which indicated moderate impairment in social or occupational functioning. (R. at 14). In assessing the Plaintiff's functional limitations due to his mental impairment, the ALJ assigned "great weight" to the assessment of Dr. Link, the state agency reviewing psychologist, who concluded that Plaintiff had no more than moderate limitations. (R. at 14).

While the ALJ focused on Dr. Hillin's findings relative to the Plaintiff's cognitive abilities, the ALJ failed to address other findings of Dr. Hillin that are material to a determination of disability. Dr. Hillin concluded that Plaintiff was markedly limited in his ability to interact appropriately with the public, supervisors and co-workers. (R. at 341). He further concluded that Plaintiff was markedly limited in his ability to respond appropriately to work pressures in a usual work setting and respond appropriately to changes in a routine work setting. (R. at 341). Dr. Hillin findings were based on the Plaintiff's low self-esteem, his paranoia regarding the discovery of his HIV status, and his moderate depression. (R. at 341). The vocational expert

---

[5] Plaintiff further argues that the ALJ erred in relying on the opinion of Dr. Wyszormierski, the state agency reviewing physician, who concluded that Plaintiff could perform less than a full range of light work. (ECF No. 8 at 20 – 22). The ALJ found Dr. Wyszormierski's assessment was "generally consistent with the evidence of record" but nonetheless limited the Plaintiff to sedentary work with limitations. (R. at 17). To the extent the ALJ relied upon Dr. Wyszormierski's assessment in rejecting Dr. Cornell's opinion, the ALJ will necessarily re-examine this opinion in conjunction with her analysis of all the evidence in the record.

testified that an individual with these limitations would not be able to work. (R. at 60 – 61). Accordingly, the ALJ is specifically directed to address this evidence on remand.

Finally, Plaintiff challenges the ALJ's credibility determination, claiming that the ALJ improperly discredited his subjective complaints. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 29 C.F.R. §§ 404.1529(a), 416.929(a); *Hartranft v. Apfel*, 181 F.3d 358, 362 (3rd Cir. 1999). In assessing subjective complaints, *SSR* 96-7p and the regulations provide that the ALJ should consider the objective medical evidence as well as other factors such as the claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); *SSR* 96-7p, 1996 WL 374186 at *2. As the finder of fact, the ALJ can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *See Baerga v. Richardson*, 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3rd Cir. 1983).

Here, the ALJ concluded that Plaintiff's subjective complaints regarding the severity of his limitations caused by his impairments were not fully credible and were not supported by the medical evidence. (R. at 17). In light of the Court's finding that the ALJ's review of the medical record was inadequate, appropriate consideration could not have been given to the Plaintiff's subjective complaints.

## VI. CONCLUSION

For the reasons discussed above, the Defendant's motion for summary judgment will be denied and the Plaintiff's motion for summary judgment will be denied. The matter will be remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion.[6] An appropriate Order follows.

---

[6] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issues addressed in this Memorandum Opinion. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3rd Cir. 2010).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM MARK SMILEY,     )
     )
     Plaintiff,     )
     )
     v.     )     Civil Action No. 10-191
     )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,     )
     )
     Defendant.     )

## ORDER

AND NOW, this 5th day of March, 2012, and for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [ECF No. 7] is DENIED and Defendant's Motion for Summary Judgment [ECF No. 9] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is hereby directed to mark the case closed.


     s/ Sean J. McLaughlin
     United States District Judge

cm: All parties of record.